## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **(1) RACHEL MATTHEWS; and** | ) | |
| **(2) CHRISTY WRIGHT;** | ) | |
| **as next friend and appointed guardian** | ) | |
| **of JM, KM, CM, EM, SP, AP, NP** | ) | |
| **GM, and MS;** | ) | |
| **et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 15-CV-676-TCK-FHM** |
| | ) | |
| **(1) STATE OF OKLAHOMA** | ) | |
| **ex rel.  OKLAHOMA DEPARTMENT** | ) | |
| **OF HUMAN SERVICES, an** | ) | |
| **agency of the State of Oklahoma;** | ) | |
| **(2) KYLA BERGDORF;** | ) | |
| **(3) WILKIE SANDERS;** | ) | |
| **(4) RONALD MOON;** | ) | |
| **(5) VINNIE HARMON;** | ) | |
| **(6) KAREN QUINN;** | ) | |
| **(7) KAREN FEATHER;** | ) | |
| **(8) MATTHEW BUDDER;** | ) | |
| **(8) BETH PANNELL;** | ) | |
| **(9) MARY NOFIRE;** | ) | |
| **(10) KRISTIN TANNER;** | ) | |
| **(11) JUANITA GIWA;** | ) | |
| **(12) NIECIE LEWIS;** | ) | |
| **(13) KATHLEEN KEANEY;** | ) | |
| **(14) LADONNA SIMS;** | ) | |
| **(15) JERRY MATTHEWS;** | ) | |
| **(16) DIEDRE MATTHEWS;** | ) | |
| **(17) BECKY DEWEY;** | ) | |
| **(18) CAROL SCHRAAD-DAHN;** | ) | |
| **(19) ANN MARIE SHRUM; and** | ) | |
| **(20) JOAN HUGHES,** | ) | |
| | ) | |
| **Defendants.[1]** | ) | |

---

[1] This caption reflects only the named Plaintiffs and Defendants remaining as of this date, rather than at the time the Complaint was filed.

## OPINION AND ORDER

Before the Court are the Motion to Dismiss of Defendant Oklahoma Department of Human Services ("DHS") (Doc. 23) and the Motion to Dismiss of Defendants Kila Bergdorf ("Bergdorf"), Ronald Moon ("Moon"), Vinne Harmon ("Harmon"), Becky Dewey ("Dewey");[2] Carol Schradd-Dahn ("Dahn"), Karen Quinn ("Quinn"), Karen Feather ("Feather"), Ann Marie Shrum ("Shrum"), Matthew Budder ("Budder"), Beth Pannell ("Panell"), Mary Nofire ("Nofire"), Kristin Tanner ("Tanner"), Joan Hughes ("Hughes"), Juanita Giwa ("Giwa"), Niecie Lewis ("Lewis"), Kathleen Keaney ("Keaney"), and LaDonna Sims ("Sims") ("DHS Employees") (Doc. 24).

## I. Factual Allegations

### A. General

This case involves alleged abuse and neglect of many children, nine of which are Plaintiffs. Only one of the abused Plaintiffs -- Rachel Matthews ("Rachel") -- has reached the age of majority. The other eight children -- JM a/k/a KM; CM; EM; SP; AP; NP; GM; and MS -- are minors ("Children") who are represented in this lawsuit by their court-appointed guardian, Christy Wright. Rachel and the Children are collectively referred to as Plaintiffs.

From 2003 to 2014, Defendants Jerry and Deidre Matthews ("the Matthews") resided in a two-bedroom trailer home on property in Delaware County, Oklahoma, and served as foster parents

---

[2] Defendants filed a Party Name Correction alleging that Defendants Becky Tanner, Becky Ringther, and Mary Kingfisher -- all the same person -- should all be corrected to the name Becky Dewey. (Doc. 13.) Plaintiffs did not object. In this Order, the Court has substituted Becky Dewey anytime Becky Tanner, Becky Ringther, or Mary Kingfisher was named in the Complaint. If this is in error, the parties may correct names at later stages of the proceedings.

for DHS.[3]   During this time, the Matthews' household included children and 2-5 adults.  Some of these children were foster children, some were ultimately adopted, some were legal wards, and others just lived with them.  From January of 2004 to March of 2014, the Delaware County DHS office received at least seventeen reports of various forms of abuse and neglect.  Each time DHS received a report, DHS notified the Matthews of the complaint and gave them advance warning that a DHS investigator would be coming at a certain date and time.  During the investigations, Plaintiffs were interviewed in the presence of the Matthews, in violation of DHS policy.  Despite clear evidence of abuse, neglect, and a dangerous home environment, DHS repeatedly left Plaintiffs in the Matthews' care.  In April of 2014, only after the Matthews' case file was transferred to the DHS Office in Craig County, Oklahoma, Plaintiffs were removed from the Matthews' care.

**B.     Timeline**

Following is a timeline of alleged referrals and other events occurring prior to the ultimate removal of Plaintiffs from the Matthews' home:

12/12/03        DHS placed Plaintiffs Rachel and GM with the Matthews.

2/04            The Matthews entered into a written compliance plan due to the use of corporal punishment on Rachel and GM.

6/12/04         The Matthews adopted Rachel and GM.

6/10/05         DHS placed Plaintiff MS, a special-needs child who uses a wheelchair, with the Matthews.

---

[3] Jerry pled guilty to a crime in 2010 and may have been incarcerated during certain relevant times.  He moved out of the home by March 2014.  Diedre resided in the home at all relevant times.

6/29/05      DHS received referral 990680, which reported that the home was dirty, the children were only bathed once per week, the children had no socks, the yard was dangerous, and a preteen boy and girl shared a bedroom.  Bergdorf and D. Johnston (non-Defendant) handled the referral, but it was "screened out" and DHS took no action.

6/5/05       DHS placed Janae Langston (non-Plaintiff) with the Matthews.

8/18/05      DHS placed Julie Ann Shade (non-Plaintiff) with the Matthews.

12/20/05     Julie Ann Shade, then age 16, gave birth to Plaintiff EM.

8/28/06      The Matthews adopted Julie Ann Shade.

1/12/06      DHS received referral 1023916, which reported inadequate supervision and dangerous living conditions.  Upon her investigation, Vickie Brumback (non-Defendant) went to the home to investigate.  Diedre was not there.  Brumback observed that GM had been spanked with a belt; several children were unsupervised in a separate trailer containing exposed nails and fiberglass; and an unknown adult was living in the home.  Upon her arrival home, Diedre was upset and told Brumback that the inspection "was not supposed to happen yet."  Brumback referred the matter to DHS for close monitoring, required a written plan of compliance, and required that the Matthews not house any more children.

1/8/07       The Matthews adopted EM.

1/11/07      The Matthews were appointed guardian of MS.

2/21/07      DHS received referral 1094023, reporting that Janae Matthews (non-Plaintiff), an adopted child of the Matthews, had welts and bruises from being beaten with a large wooden spoon.  Budder investigated, determined services were not needed, and

4

merely required Diedre to sign a voluntary family service agreement to use proper discipline methods.  Budder was supervised by Dewey.

3/30/07       DHS received referral 1100785, reporting that Janae Matthews broke her ankle while trying to escape out of a window to avoid beatings.  Sanders investigated, failed to interview the child, and no action was taken.  Sanders was supervised by P. Level (non-Defendant).

4/29/08       DHS received referral 1173079, reporting that Julie Matthews (non-Plaintiff), an adopted child of the Matthews, and her daughter, who is Plaintiff J.M., were living with the Matthews.  This referral occurred when Julie Matthews was arrested in Texas.  Shrum investigated the referral and took no action, despite that the Matthews were not to house additional children.  Shrum was supervised by Moon.

5/8/08        Diedre obtained guardianship of JM.

6/18/09       DHS received referral 1265856, reporting that ten monkeys lived inside the trailer with the children and that GM received a severe monkey bite.  Diedre reportedly treated the bite by giving the child veterinary nerve block and stitching the wound closed with needle and string she used on dogs.  Rachel was bitten twice by the same monkey and never received treatment.  It was also reported that the Matthews had other animals living outside the home, including two larger monkeys, a miniature pony, a buffalo, a pony, dogs, and cats.  Shrum investigated, determined no services were needed, and took no action.  Shrum was supervised by Harmon.

7/27/09       DHS received referral 1272041, reporting that Plaintiffs NP, AP, and SP overdosed on over-the-counter and prescription drugs found in the home and were taken to the

hospital.  Shrum investigated, determined no services were needed, and took no action.  Shrum was supervised by Feather and Dewey.

5/14/10       DHS received referral 1272041, reporting that Plaintiffs NP, CM, and KM (a/k/a JM) had marks, scrapes, and/or exceptionally poor hygiene.  The home was reported as having a terrible odor with trash piled everywhere.  Pannell investigated, found 13 children living in the home, and confirmed the reports of marks, scrapes, and poor hygiene.  Pannell nonetheless found no abuse and no dangerous conditions and found allegations of abuse unsubstantiated, even though Plaintiffs told them Diedre and Jerry made the marks.  Pannell was supervised by Dewey.

6/30/10       Law enforcement investigated the same allegations and charged Jerry Matthews with domestic assault and battery.  Jerry pleaded guilty, and DHS still did not take any action to protect Plaintiffs.

2/5/12       DHS received referral 1441380 from a school principal, reporting that Plaintiff E.M. comes to school very hungry, dirty, and smelling of urine so strongly that the principal vomited.  Hughes investigated and learned that Diedre had a stroke three weeks prior and was taking medication for bipolar disorder.  Hughes ruled out neglect or inadequate care and took no action.  Hughes was supervised by Keaney.

2/16/12       DHS received referral 1441633, reporting similar allegations that EM was dirty and had a bad odor and that the food EM brought to school had gnawing on the package from rats.  Hughes was assigned to the report but screened it out as duplicative and took no action.  Hughes was supervised by Keaney.

1/16/13     DHS received referral 1505401, reporting that EM was always digging through trash looking for food.  Lewis screened out the call and did not investigate.

2/22/13     DHS received referral 512926, reporting that AP was bitten in the face by the family's Great Dane and one of the dog's teeth remained embedded in AP's cheek. DHS also received a report regarding concerns over Diedre's mental stability and that Rachel and GM care for the children. Quinn ruled out neglect and lack of supervision, and took no action.  Quinn was supervised by Keaney.

10/31/13    DHS received referral 1564341, which was made by a friend of Jerry's.  This friend reported mental abuse and neglect of the children by Diedre, who was abusing hydrocodone, constantly sleeping, driving off the road with children in the car, verbally abusive to the children, and suicidal.  The reporter stated that the children were infested with lice and that EM was demonstrating concerning behavior, including drowning a baby goat and torturing a kitten.   Nofire and Tanner investigated, took statements from the Children that confirmed the report, and yet classified the reports of neglect and mental abuse as unsubstantiated and took no action.  Nofire and Tanner were supervised by Schweitzer (non-Defendant), and Feather.

1/31/14     DHS received referral 1581812, made by an employee of Jay Schools, reporting that Diedre had run off the road and hit a fence with children in the car, that Jerry was no longer living in the home, and that MS had complained about being spanked and not wanting to live with Diedre.  Hughes investigated, ruled out threat of harm, and took no action.  Hughes was supervised by Dahn and Schweitzer (non-Defendant).

| | |
|---|---|
| 2/26/14 | DHS received referral 1587069, reporting that GM was afraid of Rachel, that Diedre was on prescription drugs and sleeping all the time, and that Diedre drove while on medication with the Children.  Giwa screened out the referral, did not investigate, and took no action.  Giwa was supervised by Jameson (non-Defendant). |
| 2/27/14 | DHS received referral 1587553, made by the Delaware County Sheriff's Office ("DCSO"), which had taken G.M. into protective custody after a report that she had been assaulted by Rachel and absent from school for four weeks.  DCSO saw and reported the deplorable condition of the home and that Diedre was unable to clearly talk or walk.   DCSO reported neglect, dangerous shelter, failure to protect, educational abuse, and threat of harm.  Even after G.M. was taken into protective custody by DCSO, Quinn refused to take G.M. into DHS custody.  DHS took no action to protect or remove the other Children. |
| 3/1/14 | DHS received referral 1587880, reporting that: (1) Jerry had moved out; (2) adults in the home were abusing drugs; (3) there were maggots, dirty clothes, animal feces, and dead animals all over the home; and (4) Diedre was barely functioning and passing out constantly.  Sims "screened out" this referral, did not investigate, and took no action.  Sims was supervised by P. Level (non-Defendant). |
| 4/22/14 | The Matthews' case was transferred from Delaware County to Craig County.  Upon transfer, the new investigator found abuse, neglect, endangerment, lack of protection, and requested that a deprived petition be filed. |
| 4/23/14 | The District Court of Delaware County took all Plaintiffs into emergency custody based on allegations of deplorable conditions in the home; beatings with a wooden |

spoon; beatings with a belt; stabbing with used insulin needles; failing to seek medical attention for animal bites; mental abuse such as forcing Rachel to kill her pet by bashing its head into a tree; handcuffing EM and placing her in a dog cage; forcing the children to stand outside or parade around the house naked; and keeping Plaintiffs home from school to avoid detection of bruises, welts, and wounds.

### C.     Warnings by Dahn/Feather

Throughout this entire period, Plaintiffs allege that Dahn, at the direction of Feather, would call Diedre 24 to 48 hours before any home inspection to give the Matthews time to clean the home and rehearse interviews with the Children.  The calls were made with the intent to help the Matthews conceal evidence of abuse.  (*See* Compl. ¶ 83.)

### D.     Agency

Plaintiffs allege the Matthews "were acting as agents of DHS after Plaintiffs were placed with the Matthews" because "they were approved to provide care in their home as foster parents, guardians, and adoptive parents of a ward of the state."  (Compl. ¶¶ 94, 99.)  Plaintiffs also allege that DHS is responsible for the acts of all eighteen DHS Employees, including investigators and their supervisors.  (*Id.* ¶ 101.)

### E.     Claims

Plaintiffs assert the following claims: (1) 42 U.S.C. § 1983 claims against DHS Employees in their individual capacities, based on their violation of Plaintiffs' substantive due process rights under the Fourteenth Amendment; (2) *Bosh* claims arising under the Oklahoma Constitution against DHS based on DHS Employees' violation of Plaintiffs' substantive due process rights and the Matthews' use of excessive force against Plaintiffs; (3) tort claims for battery against the Matthews;

9

and (4) negligence claims against DHS and DHS Employees.  DHS moved to dismiss all claims asserted against it - namely, the *Bosh* claim and the negligence claim.  DHS Employees moved to dismiss all claims asserted against them -- namely, the § 1983 claims and the negligence claim.  The Matthews do not appear to have been served with process and have not entered an appearance in the litigation.

## II.    Rule 12(b)(6) Standard

In considering a motion to dismiss under Rule 12(b)(6), a court must determine whether the plaintiff has stated a claim upon which relief may be granted.  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "[T]he mere metaphysical possibility that *some* plaintiff could prove *some* set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that *this* plaintiff has a reasonable likelihood of mustering factual support for *these* claims."  *Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (emphasis in original).

The Tenth Circuit has interpreted "plausibility," the term used by the Supreme Court in *Twombly*, to "refer to the scope of the allegations in a complaint" rather than to mean "likely to be true." *Robbins v. Okla. ex rel. Okla. Dep't of Human Servs.*, 519 F.3d 1242, 1247 (10th Cir. 2008). Thus, "if [allegations] are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs have not nudged their claims across the line from conceivable to plausible." *Id.* (internal quotations omitted).  "The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief." *Id.*  "This requirement

10

of plausibility serves not only to weed out claims that do not (in the absence of additional allegations) have a reasonable prospect of success, but also to inform the defendants of the actual grounds of the claim against them." *Id.* at 1248.

## III.    DHS Employees' Motion to Dismiss

### A.    § 1983 Claim - Substantive Due Process

#### 1.    Pleading Requirements

In the specific context of constitutional violations committed by state actors, the Tenth Circuit has held that "plaintiffs must allege facts sufficient to show (assuming they are true) that the defendants plausibly violated their constitutional rights, and that those rights were clearly established at the time." *Id.* at 1249. "This requires enough allegations to give the defendants notice of the theory under which their claim is made" but "does not mean that complaints in cases subject to qualified immunity defenses must include 'all the factual allegations necessary to sustain a conclusion that defendant violated clearly established law.'" *Id.* Where many individual state actors are sued, the complaint must "make clear exactly who is alleged to have done what to whom, to provide each individual with fair notice as to the basis of the claims against him or her, as distinguished from collective allegations against the state." *Id.* at 1250.

In *Robbins*, which also involved allegations against individual DHS workers, the court found that the complaint failed to "isolate" the acts of each defendant, did not clarify which defendants had direct contact with the child, and merely listed "defendants" collectively without any distinction as to what acts were attributable to whom. *Id.* In contrast, Plaintiffs' Complaint specifies the acts allegedly taken by each DHS Employee. As outlined above, Plaintiffs have alleged the specific date and subject matter of a referral, the DHS investigators and supervisors associated with that referral,

and the act or omission by Defendants in response that caused or contributed to the alleged constitutional violations. The Complaint contains sufficient information regarding each named DHS Employee to provide notice of what conduct he must defend.   Further, although some DHS Employees' alleged conduct is the most egregious, such as Dahn and Feather tipping off Diedre prior to investigations, the Court finds the Complaint sufficiently alleges that each and every named DHS Employee played a role in the deprivation.   Even those mentioned only once, such as Lewis, at least plausibly bear some responsibility for failing to curtail the alleged abuse when presented with a specific referral.   Therefore, the Complaint satisfies the relevant pleading requirements and is distinguishable from *Robbins*.

### 2.    Qualified Immunity - Substantive Due Process

DHS Employees have asserted the defense of qualified immunity, which "protects governmental officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Schwartz v. Booker*, 702 F.3d 573, 579 (10th Cir. 2012).   In evaluating a motion to dismiss based on qualified immunity, the Court must (1) determine whether the Complaint sufficiently alleged violation of a constitutional right, and (2) whether that right was clearly established at the time of the violation. *Id.*

The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV.  Where the person directly inflicting harm upon the plaintiff is a private third party, state actors generally cannot be held liable for that third party's violent act. *Schwartz*, 702 F.3d at 570.

12

However, two exceptions exist, both of which are relevant here: (1) the special relationship doctrine, and (2) the state-created danger theory. *Id.*

The special relationship doctrine applies when the state asserts control over an individual sufficient to trigger an affirmative duty to provide protection. *Id.* Examples of such state control include incarceration, institutionalization, and other similar restraints of personal liberty. *Id.* (citing *DeShaney v. Winnebago Cnty. Dep't of Social Svcs.*, 489 U.S. 189, 200 (1989)). As early as 1992, the Tenth Circuit "explicitly recognized that foster children have a substantive due process right to protection while in foster care." *Id.* (citing *Yvonne L. ex rel. Lewis v. N.M. Dep't of Human Svcs.*, 959 F.2d 883 (10th Cir.1992)). A violation of this duty occurs if a state official knows of an asserted danger to a foster child yet fails to exercise professional judgment in relation to that danger, and there is an affirmative link to the injuries suffered. *Id.* The duty is ongoing and is not limited to the initial "placement" of the child. *Id.*

As to the first prong of the qualified immunity analysis, Plaintiffs have alleged sufficient facts to state a plausible substantive due process violation by at least one DHS Employee against at least one Plaintiff arising under the special relationship doctrine. For example, Plaintiffs have alleged that Quinn and Keaney took no action to protect AP, a foster child placed by DHS with the Matthews, after AP's school reported that he or she was bitten by a family dog and the tooth was still embedded in his or her cheek. Although it is less clear whether the special relationship doctrine applies to foster children who are ultimately adopted by foster parents, some of the Plaintiffs remained foster children until the time of removal in April of 2014. As to the second prong, the Court finds that Plaintiffs' substantive due process rights premised upon a special relationship with

DHS Employees was clearly established in this circuit by *Yvonne L.* in 1992 and recently confirmed by *Schwartz* in 2012.

The Court will also address whether DHS Employees enjoy qualified immunity for Plaintiffs' substantive due process claim premised upon a danger-creation theory.  A danger-creation claim against a state actor "ultimately rest[s] on the specifics of a substantive due process claim – *i.e.* a claim predicated on reckless or intentional injury-causing state action which 'shocks the conscience.'" *Armijo v. Wagon Mound Pub. Sch.*, 159 F.3d 1253, 1262 (10th Cir. 1998).  Liability is imposed based upon the state actor's "culpable knowledge and conduct in affirmatively placing an individual in a position of danger, effectively stripping a person of her ability to defend herself, or cutting off potential sources of private aid." *Id.* at 1263.  Thus, the "environment created by the state actors must be dangerous; they must know it is dangerous; and, to be liable, they must have used their authority to create an opportunity that would not otherwise have existed for the third party's [acts] to occur." *Id.*  The Tenth Circuit has articulated a six-part test governing danger-creation claims:

> (1) the charged state entity and the charged individual actors created the danger or increased plaintiff's vulnerability to the danger in some way; (2) plaintiff was a member of a limited and specifically definable group; (3) defendants' conduct put plaintiff at substantial risk of serious, immediate, and proximate harm; (4) the risk was obvious or known; (5) defendants acted recklessly in conscious disregard of that risk; and (6) such conduct, when viewed in total, is conscience shocking.

*Christiansen v. City of Tulsa*, 332 F.3d 1270, 1281 (10th Cir. 2003).

Plaintiffs have alleged sufficient facts to state a substantive due process violation by at least one DHS Employee against at least one Plaintiff arising under the danger-creation theory.  For example, Plaintiffs allege that Dahn, at the direction of Feather, repeatedly warned Diedre prior to home inspections to help the Matthews conceal their abuse and neglect.  This intentional, affirmative

14

conduct increased Plaintiffs' vulnerability to danger by enabling and prolonging an abusive situation. The conduct was committed by state actors who had unique access to information that enabled the Matthews to conceal their abuse. Another example of intentional and/or reckless, conscience-shocking conduct includes Sims' failure to investigate or take any action on referral 1587880, which reported filthy living conditions and severe drug abuse by Diedre, the only adult in the home. That referral was immediately preceded by a nearly identical report by DCSO and yet no action was taken.

As to the second prong, the Court finds that Plaintiffs' substantive due process rights premised upon the danger-creation theory were clearly established at the time of the alleged conduct based upon the elements set forth in *Christiansen*. Any reasonable DHS employee would know that tipping off an abusive foster parent before a visit, covering up findings of abuse following a visit, or otherwise abdicating their professional duties of protection could place children at substantial risk of serious, obvious, known risks of harm and be viewed as conscience-shocking. Further, there exists a factually similar Tenth Circuit decision, *Briggs v. Johnson*, 274 F. App'x 730, 736 (10th Cir. 2008). In *Briggs*, the court affirmed a denial of qualified immunity where DHS employees "discouraged individuals from continuing to report abuse" because this was affirmative conduct that increased the risk of harm to minor children and that could be deemed conscience-shocking. The allegations here are more egregious than those presented in *Briggs*.

**B.    Tort Claim**

DHS Employees assert that they are immune from suit under the Oklahoma Government Tort Claims Act ("OGTCA") because they were acting within the scope of their employment. *See* Okla. Stat. Ann. tit. 51, § 163(C) ("Suits instituted pursuant to the provisions of this act shall name as

15

defendant the state or the political subdivision against which liability is sought to be established. In no instance shall an employee of the state or political subdivision acting within the scope of his employment be named as defendant . . . .").  Scope of employment is defined as "performance by an employee acting in good faith within the duties of the employee's office or employment or of tasks lawfully assigned by a competent authority . . . but shall not include corruption or fraud." *Id.* § 152(12).  DHS Employees did not make any individualized arguments but instead argued that all DHS Employees were acting within the scope of their employment at all relevant times.

The Complaint alleges intentional actions by certain DHS Employees that could be deemed willful, wanton, in bad faith, and outside the scope of their employment.  Specifically, Plaintiffs allege that Dahn, at the direction of Feather, repeatedly warned Diedre prior to home inspections in order to assist the Matthews in concealing their abuse and neglect.   This is sufficient to survive a motion to dismiss on the question of individual immunity under the OGTCA. *See Houston v. Reich*, 932 F.2d 883, 890 (10th Cir. 1991) (jury finding that defendants who had acted willfully, wantonly and in reckless disregard of the plaintiff's constitutional rights forfeited OGTCA individual immunity).  Plaintiffs admit that their legal position on this claim is inconsistent with their legal position on their OGTCA claim against DHS, since DHS Employees must be acting *within* the scope of employment for DHS to be liable for any of their tortious conduct.  However, the Court finds the allegations could support culpability findings ranging from negligence to reckless disregard to malice by various DHS Employees, and Plaintiffs' alternative pleading is permissible under Federal Rule of Civil Procedure 8(d)(3).  Therefore, the tort claim may proceed against all DHS Employees at this time.

16

IV.     **DHS's Motion to Dismiss**

A.      *Bosh* **Claim**

In their second cause of action, Plaintiffs seek to hold DHS liable for constitutional violations committed by DHS Employees and the Matthews based on the private right of action recognized in *Bosh v. Cherokee County Building Authority*, 305 P.3d 994 (Okla. 2013), and the doctrine of respondeat superior. Plaintiffs assert two types of constitutional violations. First, Plaintiffs allege DHS Employees, as agents of DHS, both took affirmative action and failed to take action which resulted in Plaintiffs being physically abused by the Matthews. Plaintiffs contend this violates article 2, section 2 of the Oklahoma Constitution ("All persons have the inherent right to life, liberty, the pursuit of happiness, and the enjoyment of the gains of their own industry."), and article 2, section 7 of the Oklahoma Constitution ("No person shall be deprived of life, liberty, or property, without due process of law."). These two constitutional provisions substantially overlap. Article 2, section 7 provides the strongest basis for a claim because it expressly prevents deprivation of the rights rather than simply declaring an inherent right to such freedoms. Accordingly, the *Bosh* claim against DHS Employees shall be analyzed as a substantive due process claim.

Second, Plaintiffs allege the Matthews, as agents of DHS and the State, physically abused and battered Plaintiffs to an extent amounting to excessive force, in violation of article 2, section 30 of the Oklahoma Constitution ("The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches or seizures shall not be violated[.]"). Accordingly, the *Bosh* claim against the Matthews shall be analyzed as an excessive force claim.

DHS argues that *Bosh* does not extend to the substantive due process claim or the specific type of excessive force claim asserted here -- namely, where the force is committed by a state actor

17

other than law enforcement.  Essentially, DHS argues that *Bosh* is narrow and limited to its facts. DHS further argues that, even if *Bosh* does extend to Plaintiffs' alleged constitutional violations, it is still entitled to dismissal based on the Court's performance of a gatekeeping analysis that screens out cases involving mere misfeasance rather than a possible constitutional violation.

### 1.    *Bosh* Private Right of Action

In *Bosh*, the court explicitly held that section 30, article 2 of the Oklahoma Constitution provides a private cause of action for excessive force against an arrested and detained person, notwithstanding the immunities under the OGTCA and that respondeat superior applied to such cause of action.  *Id.* at 1001-02.  The Oklahoma Supreme Court has not addressed whether *Bosh* extends to constitutional violations other than excessive force.  The undersigned has predicted that the Oklahoma Supreme Court would at least extend *Bosh* to a case involving unreasonable search and seizure or other rights protected by section 30, article 2 of the Oklahoma Constitution, *see White v. City of Tulsa*, 979 F. Supp. 2d 1246, 1249 (N.D. Okla. 2013), but has not had occasion to address *Bosh*'s application to any other state constitutional protections.

Recently, the Oklahoma Court of Civil Appeals addressed the intended reach of *Bosh* in a case involving DHS.  In *GJA v. Oklahoma Department of Human Services*, 347 P.3d 310 (Okla. Civ. App.  2015), the court answered the question of whether the *"Bosh* case [should] be limited to its facts and specific holdings or does the decision stand for the proposition that the Supreme Court recognizes a broader scope of actionable claims based upon violations of constitutional rights?" *GJA*, 347 P.3d at 315.  The court interpreted *Bosh* as applying to all types of constitutional violations:

> [I]n this Court's opinion, *Bosh* stands for the proposition that the protections and guarantees afforded the citizens by the Constitutions of the State of Oklahoma and

18

> of the United States represent the highest values of the people. Violations of these
> rights and guarantees cannot be shielded under the guise or cloak of immunity.  The
> first inquiry is answered. The *Bosh* case is not limited to its facts and specific
> holding. It does stand for the proposition that the Supreme Court recognizes a
> broader scope of actionable claims based upon violations of constitutional rights.

*Id.* at 316.  This Court has no convincing authority that the Oklahoma Supreme Court will reach a

contrary conclusion and therefore follows the Oklahoma Civil Court of Appeals' decision in *GJA*.

*See Daitom, Inc. v. Pennwalt Corp.*, 741 F.2d 1569, 1574 (10th Cir.1984) (federal courts "must also

follow any intermediate state court decision unless other authority convinces us that the state

supreme court would decide otherwise").  Accordingly, *Bosh*'s cause of action is broad enough to

include the substantive due process and excessive force claims asserted in Plaintiffs' second cause

of action.[4]  Federal district court cases predicting that *Bosh* will be narrowly interpreted have less

persuasive value in light of the Oklahoma Court of Civil Appeals' ruling in *GJA*.  *See, e.g., Hedger*

*v. Kramer*, No. CIV-13-0654-HE, 2013 WL 5873348, at \*3 (W.D. Okla. Oct. 30, 2013) ("This case

obviously does not involve claims of excess force. The language of the *Bosh* opinion does not imply

that the Oklahoma Supreme Court would necessarily imply private rights of actions in other contexts

or that it would be more open to creating new private rights of action than other courts have been.");

*Bishop v. Okla. ex rel. Dep't of Human Servs.*, No. CIV-13-171-D, 2013 WL 6192114, at \*4 (W.D.

Okla. Nov. 26, 2013) ("*Bosh* suggests that it is intended to apply to law enforcement personnel . .

. .").

---

[4]  In *White*, this court already expressed its reasons for concluding *Bosh* was not limited to
its facts.  *See White,* 979 F. Supp. 2d at 1249 ("The Court interprets *Bosh* to recognize a private
cause of action for violations of the rights protected by Article 2, § 30, rather than merely
recognizing a private right of action for excessive force.").  The Court now expands this holding to
be consistent with *GJA*.

### 2.    Gatekeeping Analysis on *Bosh* Claims

In *GJA*, the court made clear that *Bosh* does not extend to "every malfeasance, misfeasance, or nonfeasance" and that *Bosh* did not "create a wide-ranging tort claim." *Id.* at 316.  Instead, the private right of action made available by *Bosh* extends only to conduct that "rises to the level" of a constitutional violation.  *Id.*  The court observed that *Bosh* itself involved "an egregious and extreme" set of circumstances.  *Id.*  In order to screen claims that do not meet this criteria either at the dismissal or summary judgment stage, the trial court must act as a "gatekeeper" and make certain "preliminary determinations."  *Id.*  The court did not provide much guidance for this gatekeeping, except (1) citing Oklahoma cases where "gatekeeping" is performed for other claims (such as intentional infliction of emotional distress), and (2) explaining that such role will resolve cases such as where a teacher committed an assault and battery on a student who was neither arrested or detained.  *Id. (citing Jackson v. Okla. Cty. Pub. Sch.*, 333 P.3d 975 (Okla. Civ. App. 2014)).

### a.    DHS Employees - Due Process

Like this case, *GJA* involved alleged due process violations resulting from DHS workers' failures to protect children from harm.  In that case, the DHS workers allegedly failed to investigate reports of physical and sexual abuse occurring while the children were in their mother's custody. The court observed that the children were not wards of the state or in the custody of DHS "so as to implicate their clearly established constitutional right to be reasonably safe from harm while in the state's custody."  *Id.* at 317.  In performing its gatekeeping role, the *GJA* court found the petition did not contain allegations giving rise to due process violations under the Oklahoma Constitution, reasoning "[a]t most, the allegations are claims of gross negligence in carrying out the investigations."  *Id.*

20

At some point in time, every Plaintiff in this case was in foster care and therefore in DHS custody.  Some Plaintiffs were ultimately adopted by the Matthews, and DHS has not argued or explained whether this changes the constitutional analysis as to those Plaintiffs.  However, certain Plaintiffs remained in foster care until they were ultimately removed from the Matthews' home and were therefore in state custody at all relevant times.  Further, the majority of allegations in this case amount to much more than negligent failure to investigate.  Certain DHS Employees allegedly took affirmative actions making it easier for the Matthews to harm Plaintiffs, such as tipping them off before a visit, interviewing the children in front of the Matthews, and willfully refusing to remove Plaintiffs from an abusive environment when they had the power and obligation to do so.  This is sufficient to survive the Court's gatekeeping analysis.  *See Halley v. Okla. ex rel. Okla. State Dep't of Human Servs.*, No. 14-CV-562-JHP, 2016 WL 1301125, at *4 (E.D. Okla. Mar. 31, 2016) (applying *GJA* and denying motion to dismiss *Bosh* claim because "Plaintiff alleges affirmative, intentional acts" by DHS worker in having child removed from school without permission or legal authority).  Other DHS Employees took actions that, while perhaps not intentional, certainly could demonstrate reckless disregard.  At later stages of the proceedings, the Court may have to parse out what *Bosh* claims may proceed on behalf of which Plaintiffs and against which Defendants.  For purposes of DHS's motion to dismiss, the Court finds Plaintiffs' allegations to be more egregious and entirely distinguishable from the complaint in *GJA*.  Accordingly, Plaintiffs have stated a claim for relief against DHS under *Bosh* based on the actions of its employees.

21

### b.      Matthews - Excessive Force

The "excessive force" claim involves the following allegations:

> The Matthews intentionally caused harmful and offensive contacts with all Plaintiffs many times as alleged throughout this Complaint, including beatings with large wooden spoons, boards, belts, and their hands which caused Plaintiffs to bleed, bruise, and blister. Plaintiff G.M. was subjected to medical care by an untrained person. Plaintiff E.M. was tied to a bed at night, then later handcuffed to a bed, then later made to sleep in a metal dog cage on the floor. Plaintiff M.S. was dragged by his arm by Diedre Matthews, leaving bruises. Plaintiff A.P. was stripped naked, then grabbed around her waist and one (1) leg spread apart, revealing her genitals, and paraded around the other Plaintiffs by Diedre Matthews. Plaintiff A.P. was also made to stand outside on the porch completely naked as a form of punishment. Plaintiff E.M. was stabbed with needles by Diedre Matthews as another form of punishment. The harmful contacts Plaintiffs suffered at the hands of the Matthews amounts to a use of excessive force by the Matthews as agents of the state.

(Compl. ¶ 103.)

Performing its gatekeeping function, the Court finds that, if the Matthews are indeed agents of the state and the harm is indeed proven, DHS could possibly be held liable under *Bosh* for excessive force by state actors against an individual while in the custody of the state. DHS has not offered any legal arguments related to the agency relationship between foster parents and DHS, or related to child abuse as a possible type of excessive force. Instead, DHS simply argued that *Bosh* should be limited to its precise facts. This Court and the Oklahoma Court of Civil Appeals have rejected that argument.

### B.      Tort Claim

In the third cause of action entitled "Government Tort Claims Act," Plaintiffs allege:

> . . . DHS was responsible for the care of Plaintiffs and had a duty to exercise ordinary care and reasonable prudence in its investigations of referrals set forth above and the home assessments of the Matthews' home. 10A O.S.C. § 1-2-101 *et seq.*; 10A O.S. § 1-7-101 *et seq.* In at least 10 instances, DHS breached its duty owed to Plaintiffs and was negligent regarding its investigations of the referrals . . . and in the home assessments of the Matthews' home. . . . DHS also failed to follow its own policies

22

and procedures regarding investigation of referrals, interviewing of Plaintiffs, and reporting neglect and abuse of Plaintiffs. . . . DHS Employee Defendants' failure to properly investigate the referrals, properly supervise the Matthews, 'tipping' the Matthews' [sic] off about investigations and willful refusal to remove Plaintiffs from the abusive and neglectful home was the actual and proximate cause of the Plaintiffs' damages.

(Compl. ¶¶ 111-116.)  DHS asserts that it is exempt from any tort liability under three specific exemptions to the OGTCA: § 155(4), § 155(18), and § 155(29).  Because § 155(4) provides immunity, the Court does not reach the other two exceptions.

Under § 155(4), DHS cannot be liable if Plaintiffs' loss or claim results from "[a]doption or enforcement of or failure to adopt or enforce a law, whether valid or invalid, including, but not limited to, any statute, charter provision, ordinance, resolution, rule, regulation or written policy[.]" Okla. Stat. tit. 51, § 155(4).  Plaintiffs' Complaint explicitly references DHS's failure to fulfill its statutory obligations under the Oklahoma Children's Code, which contains at least three relevant statutory obligations: (1) "[u]pon receipt of a report that a child may be abused, neglected or drug-endangered, the Department of Human Services shall conduct a safety analysis," Okla. Stat. tit. 10A, § 1-2-102(A)(1); (2) "[a]ny county office of the Department of Human Services receiving a child abuse or neglect report shall promptly respond to the report by initiating an investigation of the report or an assessment of the family in accordance with priority guidelines established by the Department," *id.* § 1-2-105; and (3) "[i]t shall be the responsibility of the Department of Human Services to provide care for deprived children who are committed to the custody of the Department," *id.* § 1-7-102.  Further, the Complaint alleges DHS failed to follow its own policies and procedures regarding proper investigations.

Plaintiffs' tort claims against DHS are clearly premised upon DHS Employees' tortious performance of statutory obligations and enforcement of DHS policies and procedures.  Courts have

23

consistently held that this type of action or inaction in failing to protect  children falls squarely within the protection provided by § 155(4).  *See GJA,* 347 P.3d at 314 (affirming dismissal of tort claims pursuant to § 155(4) where DHS allegedly "did nothing" regarding reports of physical and sexual abuse); *Briggs v. Okla. ex rel. Okla. Dep't of Human Servs.*, 472 F. Supp. 2d 1304, 1310 (W.D. Okla. 2007) (holding that DHS's "alleged failure to enforce or comply with the state laws associated with the investigation into reports of child abuse falls squarely within section 155(4)"); *Taylor v. Okla. ex rel. Dep't of Human Servs.*, No. 07-CV-380-GKF-PJC, 2008 WL 268333, at *4 (N.D. Okla. Jan. 29, 2008) (holding that "DHS's alleged failure to supervise and monitor its employees, who in turn failed to promptly and thoroughly investigate the charges of abuse falls squarely within section 155(4)"); *Pierce v. Okla. ex rel. Dep't of Human Servs.*, No. 08-CV-014-JHP, 2008 WL 2987190, at *3 (E.D. Okla. Aug. 1, 2008) ("Although [plaintiff] couches his claim as one for negligent hiring, training, and supervision, this is nothing more than an attempt [by plaintiff] to do indirectly what he cannot do directly -- sue DHS for the manner in which it investigated the allegation of sexual abuse that was made against him.").

Plaintiffs argue that, notwithstanding the Complaint's references to statutes and policies, their claim is based solely on "[DHS's] alleged acts of negligence - not the enforcement of or failure to enforce a statute."  (Pl.'s Resp. to Mot. to Dismiss 10.)  Plaintiffs contend that, because DHS owed the children a common-law duty of care in addition to statutory or policy-based obligations, the exception does not apply.  Plaintiffs rely upon *Smith v. Oral Roberts University*, 732 P.2d 450, 451-52 (Okla. 1986), which affirmed dismissal of a negligence claim against the City of Tulsa based on the city's failure to act under the auspices of a nuisance law permitting it to remove dangerous

24

vegetation, but reversed dismissal of that same claim to the extent it "alleges liability for the negligent maintenance of a dangerous condition on the part of the City."

Plaintiffs' arguments are unavailing.  First, the Complaint itself focuses on statutory and policy-based duties rather than common-law duties, and Plaintiffs are attempting to re-write the Complaint in their response brief.  Second, as cited above, case law addressing § 155(4) in the context of DHS's failure to protect holds that the exception applies to protect DHS in similar factual circumstances.  The single citation to *Smith* is unpersuasive in light of the more factually apposite case law cited above.  Finally, adopting Plaintiffs' argument would circumvent the Oklahoma Legislature's intent.  Regardless of whether a duty arises from common law and statute or merely statute, the crucial question is whether the state was performing (or failing to perform) statutory obligations in the course of committing the alleged torts.  The thrust of Plaintiffs' allegations is clearly that DHS carried out state law and policy in a tortious manner, requiring them to investigate reports of abuse and protect children.  Accordingly, § 155(4) applies, and dismissal is appropriate.

## V.    Conclusion

The Motion to Dismiss of DHS Employees (Doc. 24) is DENIED.  The Motion to Dismiss of Defendant Oklahoma Department of Human Services (Doc. 23) is DENIED as to the *Bosh* claim and GRANTED as to the tort claim.

**IT IS SO ORDERED this 8th day of August, 2016.**

**TERENCE KERN**
**United States District Judge**