## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **(1) RACHEL MATTHEWS; and** | ) | |
| **(2) CHRISTY WRIGHT;** | ) | |
| **as next friend and appointed guardian** | ) | |
| **of JM, KM, CM, EM, SP, AP, NP** | ) | |
| **GM, and MS;** | ) | |
| **et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 15-CV-676-TCK-FHM** |
| | ) | |
| **(1) STATE OF OKLAHOMA** | ) | |
| **ex rel. OKLAHOMA DEPARTMENT** | ) | |
| **OF HUMAN SERVICES, an** | ) | |
| **agency of the State of Oklahoma;** | ) | |
| **(2) KYLA BERGDORF;** | ) | |
| **(3) WILKIE SANDERS;** | ) | |
| **(4) RONALD MOON;** | ) | |
| **(5) VINNIE HARMON;** | ) | |
| **(6) KAREN QUINN;** | ) | |
| **(7) KAREN FEATHER;** | ) | |
| **(8) MATTHEW BUDDER;** | ) | |
| **(8) BETH PANNELL;** | ) | |
| **(9) MARY NOFIRE;** | ) | |
| **(10) KRISTIN TANNER;** | ) | |
| **(11) JUANITA GIWA;** | ) | |
| **(12) NIECIE LEWIS;** | ) | |
| **(13) KATHLEEN KEANEY;** | ) | |
| **(14) LADONNA SIMS;** | ) | |
| **(15) JERRY MATTHEWS;** | ) | |
| **(16) DIEDRE MATTHEWS;** | ) | |
| **(17) BECKY DEWEY;** | ) | |
| **(18) CAROL SCHRAAD-DAHN;** | ) | |
| **(19) ANN MARIE SHRUM; and** | ) | |
| **(20) JOAN HUGHES,** | ) | |
| | ) | |
| **Defendants.**[1] | ) | |

---

[1] This caption reflects only the named Plaintiffs and Defendants remaining as of this date, rather than at the time the Complaint was filed.

## AMENDED OPINION AND ORDER

Before the Court are the Motion to Dismiss of Defendant Oklahoma Department of Human Services ("DHS") (Doc. 23) and the Motion to Dismiss of Defendants Kila Bergdorf ("Bergdorf"), Ronald Moon ("Moon"), Vinne Harmon ("Harmon"), Becky Dewey ("Dewey");[2] Carol Schradd-Dahn ("Dahn"), Karen Quinn ("Quinn"), Karen Feather ("Feather"), Ann Marie Shrum ("Shrum"), Matthew Budder ("Budder"), Beth Pannell ("Panell"), Mary Nofire ("Nofire"), Kristin Tanner ("Tanner"), Joan Hughes ("Hughes"), Juanita Giwa ("Giwa"), Niecie Lewis ("Lewis"), Kathleen Keaney ("Keaney"), and LaDonna Sims ("Sims") ("DHS Employees") (Doc. 24).

Also before the Court is DHS' Motion for Relief from Order and for Reconsideration (Doc. 54). Such motion is granted, and the Court's original Opinion and Order (Doc. 51) ruling on the above motions is vacated. This Amended Opinion and Order constitutes the Court's ruling on all issues originally presented by the motions.

## I.     Factual Allegations

### A.     General

This case involves alleged abuse and neglect of many children, nine of which are Plaintiffs. Only one of the abused Plaintiffs -- Rachel Matthews ("Rachel") -- has reached the age of majority. The other eight children -- JM a/k/a KM; CM; EM; SP; AP; NP; GM; and MS -- are minors ("Children") who are represented in this lawsuit by their court-appointed guardian, Christy Wright. Rachel and the Children are collectively referred to as Plaintiffs.

---

[2] Defendants filed a Party Name Correction alleging that Defendants Becky Tanner, Becky Ringther, and Mary Kingfisher -- all the same person -- should all be corrected to the name Becky Dewey. (Doc. 13.) Plaintiffs did not object. In this Order, the Court has substituted Becky Dewey anytime Becky Tanner, Becky Ringther, or Mary Kingfisher was named in the Complaint. If this is in error, the parties may correct names at later stages of the proceedings.

From 2003 to 2014, Defendants Jerry and Deidre Matthews ("the Matthews") resided in a two-bedroom trailer home on property in Delaware County, Oklahoma, and served as foster parents for DHS.[3]   During this time, the Matthews' household included children and 2-5 adults.  Some of these children were foster children, some were ultimately adopted, some were legal wards, and others just lived with them.  From January of 2004 to March of 2014, the Delaware County DHS office received at least seventeen reports of various forms of abuse and neglect.  Each time DHS received a report, DHS notified the Matthews of the complaint and gave them advance warning that a DHS investigator would be coming at a certain date and time.  During the investigations, Plaintiffs were interviewed in the presence of the Matthews, in violation of DHS policy.  Despite clear evidence of abuse, neglect, and a dangerous home environment, DHS repeatedly left Plaintiffs in the Matthews' care.  In April of 2014, only after the Matthews' case file was transferred to the DHS Office in Craig County, Oklahoma, Plaintiffs were removed from the Matthews' care.

**B.    Timeline**

Following is a timeline of alleged referrals and other events occurring prior to the ultimate removal of Plaintiffs from the Matthews' home:

12/12/03        DHS placed Plaintiffs Rachel and GM with the Matthews.

2/04              The Matthews entered into a written compliance plan due to the use of corporal punishment on Rachel and GM.

6/12/04          The Matthews adopted Rachel and GM.

---

[3] Jerry pled guilty to a crime in 2010 and may have been incarcerated during certain relevant times.  He moved out of the home by March 2014.  Diedre resided in the home at all relevant times.

| | |
|---|---|
| 6/10/05 | DHS placed Plaintiff MS, a special-needs child who uses a wheelchair, with the Matthews. |
| 6/29/05 | DHS received referral 990680, which reported that the home was dirty, the children were only bathed once per week, the children had no socks, the yard was dangerous, and a preteen boy and girl shared a bedroom.  Bergdorf and D. Johnston (non-Defendant) handled the referral, but it was "screened out" and DHS took no action. |
| 6/5/05 | DHS placed Janae Langston (non-Plaintiff) with the Matthews. |
| 8/18/05 | DHS placed Julie Ann Shade (non-Plaintiff) with the Matthews. |
| 12/20/05 | Julie Ann Shade, then age 16, gave birth to Plaintiff EM. |
| 8/28/06 | The Matthews adopted Julie Ann Shade. |
| 1/12/06 | DHS received referral 1023916, which reported inadequate supervision and dangerous living conditions.  Upon her investigation, Vickie Brumback (non-Defendant) went to the home to investigate.  Diedre was not there.  Brumback observed that GM had been spanked with a belt; several children were unsupervised in a separate trailer containing exposed nails and fiberglass; and an unknown adult was living in the home.  Upon her arrival home, Diedre was upset and told Brumback that the inspection "was not supposed to happen yet."  Brumback referred the matter to DHS for close monitoring, required a written plan of compliance, and required that the Matthews not house any more children. |
| 1/8/07 | The Matthews adopted EM. |
| 1/11/07 | The Matthews were appointed guardian of MS. |

| | |
|---|---|
| 2/21/07 | DHS received referral 1094023, reporting that Janae Matthews (non-Plaintiff), an adopted child of the Matthews, had welts and bruises from being beaten with a large wooden spoon.  Budder investigated, determined services were not needed, and merely required Diedre to sign a voluntary family service agreement to use proper discipline methods.  Budder was supervised by Dewey. |
| 3/30/07 | DHS received referral 1100785, reporting that Janae Matthews broke her ankle while trying to escape out of a window to avoid beatings.  Sanders investigated, failed to interview the child, and no action was taken.  Sanders was supervised by P. Level (non-Defendant). |
| 4/29/08 | DHS received referral 1173079, reporting that Julie Matthews (non-Plaintiff), an adopted child of the Matthews, and her daughter, who is Plaintiff J.M., were living with the Matthews.  This referral occurred when Julie Matthews was arrested in Texas.  Shrum investigated the referral and took no action, despite that the Matthews were not to house additional children.  Shrum was supervised by Moon. |
| 5/8/08 | Diedre obtained guardianship of JM. |
| 6/18/09 | DHS received referral 1265856, reporting that ten monkeys lived inside the trailer with the children and that GM received a severe monkey bite.  Diedre reportedly treated the bite by giving the child veterinary nerve block and stitching the wound closed with needle and string she used on dogs.  Rachel was bitten twice by the same monkey and never received treatment.  It was also reported that the Matthews had other animals living outside the home, including two larger monkeys, a miniature |

5

pony, a buffalo, a pony, dogs, and cats.  Shrum investigated, determined no services were needed, and took no action.  Shrum was supervised by Harmon.

7/27/09   DHS received referral 1272041, reporting that Plaintiffs NP, AP, and SP overdosed on over-the-counter and prescription drugs found in the home and were taken to the hospital.  Shrum investigated, determined no services were needed, and took no action.  Shrum was supervised by Feather and Dewey.

5/14/10   DHS received referral 1272041, reporting that Plaintiffs NP, CM, and KM (a/k/a JM) had marks, scrapes, and/or exceptionally poor hygiene.  The home was reported as having a terrible odor with trash piled everywhere.  Pannell investigated, found 13 children living in the home, and confirmed the reports of marks, scrapes, and poor hygiene. Pannell nonetheless found no abuse and no dangerous conditions and found allegations of abuse unsubstantiated, even though Plaintiffs told them Diedre and Jerry made the marks.  Pannell was supervised by Dewey.

6/30/10   Law enforcement investigated the same allegations and charged Jerry Matthews with domestic assault and battery.  Jerry pleaded guilty, and DHS still did not take any action to protect Plaintiffs.

2/5/12    DHS received referral 1441380 from a school principal, reporting that Plaintiff E.M. comes to school very hungry, dirty, and smelling of urine so strongly that the principal vomited.  Hughes investigated and learned that Diedre had a stroke three weeks prior and was taking medication for bipolar disorder.  Hughes ruled out neglect or inadequate care and took no action.  Hughes was supervised by Keaney.

2/16/12        DHS received referral 1441633, reporting similar allegations that EM was dirty and had a bad odor and that the food EM brought to school had gnawing on the package from rats.  Hughes was assigned to the report but screened it out as duplicative and took no action.  Hughes was supervised by Keaney.

1/16/13        DHS received referral 1505401, reporting that EM was always digging through trash looking for food.  Lewis screened out the call and did not investigate.

2/22/13        DHS received referral 512926, reporting that AP was bitten in the face by the family's Great Dane and one of the dog's teeth remained embedded in AP's cheek. DHS also received a report regarding concerns over Diedre's mental stability and that Rachel and GM care for the children. Quinn ruled out neglect and lack of supervision, and took no action.  Quinn was supervised by Keaney.

10/31/13       DHS received referral 1564341, which was made by a friend of Jerry's.  This friend reported mental abuse and neglect of the children by Diedre, who was abusing hydrocodone, constantly sleeping, driving off the road with children in the car, verbally abusive to the children, and suicidal.  The reporter stated that the children were infested with lice and that EM was demonstrating concerning behavior, including drowning a baby goat and torturing a kitten.   Nofire and Tanner investigated, took statements from the Children that confirmed the report, and yet classified the reports of neglect and mental abuse as unsubstantiated and took no action.  Nofire and Tanner were supervised by Schweitzer (non-Defendant), and Feather.

| | |
|---|---|
| 1/31/14 | DHS received referral 1581812, made by an employee of Jay Schools, reporting that Diedre had run off the road and hit a fence with children in the car, that Jerry was no longer living in the home, and that MS had complained about being spanked and not wanting to live with Diedre.  Hughes investigated, ruled out threat of harm, and took no action.  Hughes was supervised by Dahn and Schweitzer (non-Defendant). |
| 2/26/14 | DHS received referral 1587069, reporting that GM was afraid of Rachel, that Diedre was on prescription drugs and sleeping all the time, and that Diedre drove while on medication with the Children.  Giwa screened out the referral, did not investigate, and took no action.  Giwa was supervised by Jameson (non-Defendant). |
| 2/27/14 | DHS received referral 1587553, made by the Delaware County Sheriff's Office ("DCSO"), which had taken G.M. into protective custody after a report that she had been assaulted by Rachel and absent from school for four weeks.  DCSO saw and reported the deplorable condition of the home and that Diedre was unable to clearly talk or walk.  DCSO reported neglect, dangerous shelter, failure to protect, educational abuse, and threat of harm.  Even after G.M. was taken into protective custody by DCSO, Quinn refused to take G.M. into DHS custody.  DHS took no action to protect or remove the other Children. |
| 3/1/14 | DHS received referral 1587880, reporting that: (1) Jerry had moved out; (2) adults in the home were abusing drugs; (3) there were maggots, dirty clothes, animal feces, and dead animals all over the home; and (4) Diedre was barely functioning and passing out constantly.  Sims "screened out" this referral, did not investigate, and took no action.  Sims was supervised by P. Level (non-Defendant). |

| 4/22/14 | The Matthews' case was transferred from Delaware County to Craig County. Upon transfer, the new investigator found abuse, neglect, endangerment, lack of protection, and requested that a deprived petition be filed. |
|---|---|
| 4/23/14 | The District Court of Delaware County took all Plaintiffs into emergency custody based on allegations of deplorable conditions in the home; beatings with a wooden spoon; beatings with a belt; stabbing with used insulin needles; failing to seek medical attention for animal bites; mental abuse such as forcing Rachel to kill her pet by bashing its head into a tree; handcuffing EM and placing her in a dog cage; forcing the children to stand outside or parade around the house naked; and keeping Plaintiffs home from school to avoid detection of bruises, welts, and wounds. |

### C.    Warnings by Dahn/Feather

Throughout this entire period, Plaintiffs allege that Dahn, at the direction of Feather, would call Diedre 24 to 48 hours before any home inspection to give the Matthews time to clean the home and rehearse interviews with the Children. The calls were made with the intent to help the Matthews conceal evidence of abuse. (*See* Compl. ¶ 83.)

### D.    Agency

Plaintiffs allege the Matthews "were acting as agents of DHS after Plaintiffs were placed with the Matthews" because "they were approved to provide care in their home as foster parents, guardians, and adoptive parents of a ward of the state." (Compl. ¶¶ 94, 99.) Plaintiffs also allege that DHS is responsible for the acts of all eighteen DHS Employees, including investigators and their supervisors. (*Id.* ¶ 101.)

### E.      Claims

Plaintiffs' Complaint sets forth three "causes of action," which include: (1) "Civil Rights Claim under 42 U.S.C. § 1983"; (2) "Battery/Excessive Force"; and (3) "Government Tort Claims Act." Construed liberally and in light of clarification provided in Plaintiffs' briefs, the Court construes the Complaint as asserting two claims against DHS Employees in their individual capacities: (1) violation of 42 U.S.C. § 1983, premised upon DHS Employees' violation of Plaintiffs' Fourteenth Amendment substantive due process rights arising under the U.S. Constitution ("§1983 claims"); and (2) negligence. The Court construes the Complaint as asserting two claims against DHS: (1) violation of the Oklahoma Constitution, premised upon *Bosh v. Cherokee County Building Authority*, 305 P.3d 994 (Okla. 2013), and "respondeat superior" liability for DHS Employees' and the Matthews' violations of the Oklahoma Constitution ("*Bosh* claim"); and (2) negligence. Finally, the Court construes the Complaint as asserting a battery claim against the Matthews.[4]

## II.     DHS' Motion to Dismiss

DHS moved to dismiss both claims asserted against it - the *Bosh* claim and the negligence claim - based on Eleventh Amendment immunity. Once raised, the Eleventh Amendment becomes a limitation on this Court's subject-matter jurisdiction. *Harris v. Owens*, 264 F.3d 1282, 1288 (10th Cir. 2001). Therefore, the Court must address DHS' assertion of immunity before addressing any alternative arguments.[5]

---

[4]  The Matthews do not appear to have been served with process and have not entered an appearance in the litigation.

[5]  In addition to immunity, DHS raised alternative arguments regarding each claim. In its original Opinion and Order dated August 8, 2016, the Court addressed only these alternative

The Eleventh Amendment to the United States Constitution provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. Although not expressly provided in the constitutional language, the Eleventh Amendment has been interpreted to also bar a suit by a citizen against the citizen's own state in federal court. *Johns v. Stewart*, 57 F.3d 1544, 1552 (10th Cir. 1995). This generally bars federal lawsuits against the state or its agencies, and immunity attaches whether the relief sought is legal or equitable. *Id.*; *ANR Pipeline Co. v. LaFaver*, 150 F.3d 1178, 1187 (10th Cir. 1998) ("The Eleventh Amendment bars a federal suit against a state agency regardless of the type of relief sought.").

Plaintiffs sued the "State of Oklahoma, ex rel. Oklahoma Department of Human Services, an agency of the State of Oklahoma" and do not dispute that DHS functions as an arm of the state. This conclusion is supported by case law. *See McKinney v. State of Okla., Dep't of Human Servs., Shawnee Okla.*, 925 F.2d 363, 365 (10th Cir. 1991); *Legates v. Okla. ex rel. Rogers Cty. Dep't of Human Servs.*, No. 09-CV-29-FHM, 2010 WL 4941437, at *4 (N.D. Okla. Nov. 30, 2010) ("DHS is an arm of the State of Oklahoma to which immunity under the Eleventh Amendment applies."). Therefore, DHS enjoys immunity from suit in federal court on both the negligence claim and the *Bosh* claim unless an exception applies.

---

arguments. The Court failed to address DHS' assertion of Eleventh Amendment immunity in the first instance. Upon reconsideration of DHS' arguments, the Court finds dismissal of both claims appropriate on Eleventh Amendment grounds. Therefore, the Court grants DHS' motion to reconsider, vacates its prior Opinion and Order, and issues this Amended Opinion and Order.

State sovereign immunity is not absolute, and there are three exceptions to its applicability. *Johns*, 57 F.3d at 1553. First, the *Ex parte Young* doctrine permits federal lawsuits to prospectively enjoin state officials from violating federal law so that federal courts may "hold state officials responsible to the supreme authority of the United States." *Id.*[6] Second, Congress can abrogate state sovereign immunity with "unmistakably clear" language in a federal statute. *Id.* Finally, the state itself can waive immunity and consent to suit in federal court. *Id.*

In this case, the *Bosh* claim and negligence claim asserted against DHS arise under state law; thus, neither *Ex parte Young* nor congressional abrogation applies. Instead, Plaintiffs rely upon the waiver exception. Specifically, Plaintiffs argue that the State of Oklahoma waived immunity by statute because their claims "either fall within the GTCA or outside the GTCA, *i.e.*, the Oklahoma constitutional violation commonly referred to as the *Bosh* claim." (*See* Pl.'s Resp. to Mot. to Reconsider 5.) Plaintiffs "posit that the *Bosh* claim is outside the protection of the reservation of Eleventh Amendment immunity as reserved under the GTCA." (*Id.*) The Court construes these arguments as asserting two possible methods of waiver: (1) the State of Oklahoma waived immunity on the negligence claim and/or *Bosh* claim in the text of the Oklahoma Governmental Tort Claims Act ("OGTCA"); and (2) the Oklahoma Supreme Court necessarily waived Eleventh Amendment immunity and/or carved out another type of exception to Eleventh Amendment immunity when it created the *Bosh* cause of action.[7]

---

[6] The rationale underlying the *Ex parte Young* doctrine does not apply when the alleged violation is of state law because federal courts would intrude on state sovereignty by "instruct[ing] state officials how to conform their conduct to state law." *Id.*

[7] In a footnote, Plaintiffs discussed DHS' receipt of federal assistance and that such receipt "may waive" immunity. (Resp. to Mot. to Reconsider at 4 n.4.) This argument is cursory, does not contain legal citations, and need not be addressed by the Court.

### A.      Waiver in OGTCA

A state may effectuate a waiver of its Eleventh Amendment immunity by a state statute. *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 238 n.1 (1985). However, such a waiver must specify the state's intent to subject itself to suit in federal court with the "most express language or by such overwhelming implication from the text as will leave no room for any other reasonable construction." *Id.* at 239-40.

The OGTCA does not contain any language consenting to suit in federal court. *Harris v. Okla. Office of Juvenile Affairs ex rel. Cent. Okla. Juvenile Ctr.*, 519 F. App'x 978, 980 (10th Cir. 2013) ("The waiver of immunity in the OGTCA extends only to the State of Oklahoma's immunity in its *own* courts."). In fact, the OGTCA states "it is *not* the intent of the state to waive any rights under the Eleventh Amendment to the United States Constitution." Okla. Stat. Tit. 51, § 152.1(B) (emphasis added). The Tenth Circuit has rejected the argument that the "non-waiver" in § 152.1(B) applies only to *federal* claims brought in federal court and not to *state* claims brought in federal court under pendent jurisdiction. *Harris*, 519 F. App'x at 980. Therefore, Oklahoma has not waived immunity for either the negligence claim or the *Bosh* claim in the statutory text of the OGTCA.

### B.      Waiver by Recognition of *Bosh* Claim

In *Bosh*, the Oklahoma Supreme Court held that section 30, article 2 of the Oklahoma Constitution provides a private cause of action for excessive force against an arrested and detained person, notwithstanding the express exclusion (*i.e.*, non-waiver) for suits related to operation of prison facilities contained in the OGTCA. *Bosh v. Cherokee Cty. Bldg. Auth.,* 305 P.3d 994, 1001-02 (Okla. 2013). Soon after *Bosh,* the undersigned predicted the Oklahoma Supreme Court would extend *Bosh* to a case involving an unreasonable search and seizure or other rights protected by

13

section 30, article 2 of the Oklahoma Constitution. *See White v. City of Tulsa*, 979 F. Supp. 2d 1246, 1249 (N.D. Okla. 2013).

In 2014, the Oklahoma Supreme Court decided *Perry v. City of Norman*, 341 P.3d 689, 693 (Okla. 2014), which held that a *Bosh* "claim for excessive force against a municipality may not be brought against a governmental entity when a cause of action under the OGTCA is available." The court affirmed dismissal of a *Bosh* claim because the plaintiff had an alternative remedy under the OGTCA. *Id.* The Oklahoma Supreme Court clarified that the *Bosh* cause of action was recognized only because the OGTCA "expressly immunized the state and political subdivisions . . . from liability arising out of the operation of prison facilities" and that it would not have created the cause of action had an adequate tort remedy existed. *Id.* at 692. Thus, a *Bosh* claim is only available if the alleged conduct is otherwise immunized by the OGTCA. *See Aery v. Nuckolls*, No. 15-CV-0624-CVE-TLW, 2016 WL 5795322, at *5 (N.D. Okla. Oct. 4, 2016) ("There is no blanket immunity here barring plaintiff from bringing a claim under the OGTCA like there was in *Bosh*. Therefore, the reasoning of *Bosh*, to prevent governmental entities from immunizing themselves from liability for violations of the Oklahoma Constitution, does not apply here.").

Recently, in 2015, the Oklahoma Court of Civil Appeals addressed the scope of *Bosh* in a case against DHS. In *G.J.A. v. Oklahoma Department of Human Services*, 347 P.3d 310 (Okla. Civ. App. 2015), the court addressed whether the *Bosh* is "limited to its facts and specific holdings" or "stand[s] for the proposition that the Supreme Court recognizes a broader scope of actionable claims based upon violations of constitutional rights?" *G.J.A.*, 347 P.3d at 315. The court interpreted *Bosh* as applying to all types of constitutional violations:

> [I]n this Court's opinion, *Bosh* stands for the proposition that the protections and guarantees afforded the citizens by the Constitutions of the State of Oklahoma and

14

of the United States represent the highest values of the people. Violations of these rights and guarantees cannot be shielded under the guise or cloak of immunity. The first inquiry is answered. The *Bosh* case is not limited to its facts and specific holding. It does stand for the proposition that the Supreme Court recognizes a broader scope of actionable claims based upon violations of constitutional rights.

*Id.* at 316. Courts and commentators continue to grapple with the intended scope of *Bosh*. *See Petty v. Dep't of Human Servs.*, No. 16-CV-109-GKF-FHM, 2016 WL 3211965, at *5 (N.D. Okla. June 9, 2016) ("The scope of *Bosh*'s holding has been a source of considerable disagreement among Oklahoma's federal and lower state courts.") (collecting cases and declining to exercise supplemental jurisdiction due to novelty of state question);[8] Nick Coffey, *Bosh and the Constitutional Cause of Action: The Corridor to Civil Liberties*, 68 Okla. L. Rev. 621 (2016) (discussing "the now widespread confusion in state and federal courts regarding *Bosh*'s scope").

Regardless of the scope of *Bosh* and whether *Bosh* extends to the types of constitutional claims asserted here, the Court holds that DHS, as a state entity, enjoys immunity from defending a *Bosh* claim in federal court. The Court is not aware of any case holding that a state's highest court – in carving out a new private right of action arising under a state constitution – can somehow "waive" a state's immunity from suit in federal court. Nor did the Oklahoma Supreme Court indicate that a *Bosh* claim could be brought in federal court regardless of the state's assertion of Eleventh Amendment immunity. Plaintiffs' contention that their claim for money damages against DHS must proceed because it either falls "within the GTCA or outside the GTCA" is simply misplaced. Because a *Bosh* claim is "non-immunized" in state court does not mean that same *Bosh* claim is "non-immunized" in federal court. Therefore, a *Bosh* claim (be it limited to excessive force

---

[8] That decision does not discuss whether DHS enjoyed immunity from suit in federal court on the *Bosh* claim.

against prisoners or recognized in some broader formulation) may not be asserted in federal court against an arm of the state such as DHS.[9]

## III.     DHS Employees' Motion to Dismiss

### A.       § 1983 Claim - Substantive Due Process

#### 1.       Pleading Requirements

In the specific context of constitutional violations committed by state actors, the Tenth Circuit has held that "plaintiffs must allege facts sufficient to show (assuming they are true) that the defendants plausibly violated their constitutional rights, and that those rights were clearly established at the time." *Id.* at 1249. "This requires enough allegations to give the defendants notice of the theory under which their claim is made" but "does not mean that complaints in cases subject to qualified immunity defenses must include 'all the factual allegations necessary to sustain a conclusion that defendant violated clearly established law.'" *Id.* Where many individual state actors are sued, the complaint must "make clear exactly who is alleged to have done what to whom, to provide each individual with fair notice as to the basis of the claims against him or her, as distinguished from collective allegations against the state." *Id.* at 1250.

In *Robbins*, which also involved allegations against individual DHS workers, the court found that the complaint failed to "isolate" the acts of each defendant, did not clarify which defendants had direct contact with the child, and merely listed "defendants" collectively without any distinction as

_____

[9] Notably, a *Bosh* claim can be asserted in federal court against political subdivisions *not* deemed "arms of the State." *See Steadfast Ins. Co. v. Agric. Ins. Co.*, 507 F.3d 1250, 1253 (10th Cir. 2007) ("In terms of scope, Eleventh Amendment immunity extends to states and state entities but not to counties, municipalities, or other local government."). Unlike counties and municipalities, DHS is a state entity.

to what acts were attributable to whom.  *Id.*  In contrast, Plaintiffs' Complaint specifies the acts allegedly taken by each DHS Employee.  As outlined above, Plaintiffs have alleged the specific date and subject matter of a referral, the DHS investigators and supervisors associated with that referral, and the act or omission by Defendants in response that caused or contributed to the alleged constitutional violations.  The Complaint contains sufficient information regarding each named DHS Employee to provide notice of what conduct he must defend.   Further, although some DHS Employees' alleged conduct is the most egregious, such as Dahn and Feather tipping off Diedre prior to investigations, the Court finds the Complaint sufficiently alleges that each and every named DHS Employee played a role in the deprivation.  Even those mentioned only once, such as Lewis, at least plausibly bear some responsibility for failing to curtail the alleged abuse when presented with a specific referral.  Therefore, the Complaint satisfies the relevant pleading requirements and is distinguishable from *Robbins*.

## 2.   Qualified Immunity

DHS Employees have collectively asserted the defense of qualified immunity, which "protects governmental officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Schwartz v. Booker*,  702 F.3d 573, 579 (10th Cir. 2012).  DHS Employees did not make any individualized arguments regarding qualified immunity and instead argued merely that dismissal was warranted because there were no alleged actions that were "conscience shocking."  (*See* DHS Employees' Mot. To Dismiss 11.)  Thus, the Court has analyzed the allegations to determine if there are any possible claims.  In evaluating a motion to dismiss based on qualified immunity, the Court

must (1) determine whether the Complaint sufficiently alleged violation of a constitutional right, and (2) whether that right was clearly established at the time of the violation. *Id.*

The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. Where the person directly inflicting harm upon the plaintiff is a private third party, state actors generally cannot be held liable for that third party's violent act. *Schwartz*, 702 F.3d at 570. However, two exceptions exist, both of which are relevant here: (1) the special relationship doctrine, and (2) the state-created danger theory. *Id.*

The special relationship doctrine applies when the state asserts control over an individual sufficient to trigger an affirmative duty to provide protection. *Id.* Examples of such state control include incarceration, institutionalization, and other similar restraints of personal liberty. *Id.* (citing *DeShaney v. Winnebago Cnty. Dep't of Social Svcs.*, 489 U.S. 189, 200 (1989)). As early as 1992, the Tenth Circuit "explicitly recognized that foster children have a substantive due process right to protection while in foster care." *Id.* (citing *Yvonne L. ex rel. Lewis v. N.M. Dep't of Human Svcs.*, 959 F.2d 883 (10th Cir.1992)). A violation of this duty occurs if a state official knows of an asserted danger to a foster child yet fails to exercise professional judgment in relation to that danger, and there is an affirmative link to the injuries suffered. *Id.* The duty is ongoing and is not limited to the initial "placement" of the child. *Id.*

As to the first prong of the qualified immunity analysis, Plaintiffs have alleged sufficient facts to state a plausible substantive due process violation by at least one DHS Employee against at least one Plaintiff arising under the special relationship doctrine. For example, Plaintiffs have alleged that Quinn and Keaney took no action to protect AP, a foster child placed by DHS with the

18

Matthews, after AP's school reported that he or she was bitten by a family dog and the tooth was still embedded in his or her cheek.  Although it is less clear whether the special relationship doctrine applies to foster children who are ultimately adopted by foster parents, some of the Plaintiffs remained foster children until the time of removal in April of 2014.  Therefore, the Court rejects DHS' argument that dismissal is proper based on the absence of any alleged conscience-shocking actions in the Complaint.  As to the second prong, the Court finds that Plaintiffs' substantive due process rights premised upon a special relationship with DHS Employees was clearly established in this circuit by *Yvonne L.* in 1992 and recently confirmed by *Schwartz* in 2012.

The Court will also address whether DHS Employees enjoy qualified immunity for Plaintiffs' substantive due process claim premised upon a danger-creation theory.  A danger-creation claim against a state actor "ultimately rest[s] on the specifics of a substantive due process claim – *i.e.* a claim predicated on reckless or intentional injury-causing state action which 'shocks the conscience.'"  *Armijo v. Wagon Mound Pub. Sch.*, 159 F.3d 1253, 1262 (10th Cir. 1998).  Liability is imposed based upon the state actor's "culpable knowledge and conduct in affirmatively placing an individual in a position of danger, effectively stripping a person of her ability to defend herself, or cutting off potential sources of private aid."  *Id.* at 1263.  Thus, the "environment created by the state actors must be dangerous; they must know it is dangerous; and, to be liable, they must have used their authority to create an opportunity that would not otherwise have existed for the third party's [acts] to occur."  *Id.*  The Tenth Circuit has articulated a six-part test governing danger-creation claims:

> (1) the charged state entity and the charged individual actors created the danger or increased plaintiff's vulnerability to the danger in some way; (2) plaintiff was a member of a limited and specifically definable group; (3) defendants' conduct put plaintiff at substantial risk of serious, immediate, and proximate harm; (4) the risk

was obvious or known; (5) defendants acted recklessly in conscious disregard of that risk; and (6) such conduct, when viewed in total, is conscience shocking.

*Christiansen v. City of Tulsa*, 332 F.3d 1270, 1281 (10th Cir. 2003).

Again, DHS Employees did not make any individualized arguments. Plaintiffs have alleged sufficient facts to state a substantive due process violation by at least one DHS Employee against at least one Plaintiff arising under the danger-creation theory. For example, Plaintiffs allege that Dahn, at the direction of Feather, repeatedly warned Diedre prior to home inspections to help the Matthews conceal their abuse and neglect. This intentional, affirmative conduct increased Plaintiffs' vulnerability to danger by enabling and prolonging an abusive situation. The conduct was committed by state actors who had unique access to information that enabled the Matthews to conceal their abuse. Another example of intentional and/or reckless, conscience-shocking conduct includes Sims' failure to investigate or take any action on referral 1587880, which reported filthy living conditions and severe drug abuse by Diedre, the only adult in the home. That referral was immediately preceded by a nearly identical report by DCSO and yet no action was taken.

As to the second prong, the Court finds that Plaintiffs' substantive due process rights premised upon the danger-creation theory were clearly established at the time of the alleged conduct based upon the elements set forth in *Christiansen*. Any reasonable DHS employee would know that tipping off an abusive foster parent before a visit, covering up findings of abuse following a visit, or otherwise abdicating their professional duties of protection could place children at substantial risk of serious, obvious, known risks of harm and be viewed as conscience-shocking. Further, there exists a factually similar Tenth Circuit decision, *Briggs v. Johnson*, 274 F. App'x 730, 736 (10th Cir. 2008). In *Briggs*, the court affirmed a denial of qualified immunity where DHS employees "discouraged individuals from continuing to report abuse" because this was affirmative conduct that

20

increased the risk of harm to minor children and that could be deemed conscience-shocking. The allegations here are more egregious than those presented in *Briggs*.

### B.      Tort Claim

DHS Employees assert that they are immune from suit under the Oklahoma Government Tort Claims Act ("OGTCA") because they were acting within the scope of their employment. *See* Okla. Stat. Ann. tit. 51, § 163(c) ("Suits instituted pursuant to the provisions of this act shall name as defendant the state or the political subdivision against which liability is sought to be established. In no instance shall an employee of the state or political subdivision acting within the scope of his employment be named as defendant . . . ."). Scope of employment is defined as "performance by an employee acting in good faith within the duties of the employee's office or employment or of tasks lawfully assigned by a competent authority . . . but shall not include corruption or fraud." *Id.* § 152(12). Again, DHS Employees did not make any individualized arguments regarding their specific conduct but instead argued that all DHS Employees were acting within the scope of their employment at all relevant times.

The Complaint alleges intentional actions by certain DHS Employees that could be deemed willful, wanton, in bad faith, and outside the scope of their employment. Specifically, Plaintiffs allege that Dahn, at the direction of Feather, repeatedly warned Diedre prior to home inspections in order to assist the Matthews in concealing their abuse and neglect. This is sufficient to survive a motion to dismiss on the question of individual immunity under the OGTCA. *See Houston v. Reich*, 932 F.2d 883, 890 (10th Cir. 1991) (jury finding that defendants who had acted willfully, wantonly and in reckless disregard of the plaintiff's constitutional rights forfeited OGTCA individual immunity). Therefore, the tort claim may proceed against all DHS Employees at this time.

**V.**     **Conclusion**

DHS' Motion for Relief from Order and for Reconsideration (Doc. 54) is GRANTED.  The Court's prior Opinion and Order (Doc. 51) is VACATED.

The Motion to Dismiss of DHS Employees (Doc. 24) is DENIED.  The Motion to Dismiss of Defendant Oklahoma Department of Human Services (Doc. 23) is GRANTED.  The claims against DHS are dismissed without prejudice.

**IT IS SO ORDERED this 17th day of October, 2016.**


_Terence Kern_

**TERENCE KERN**
**United States District Judge**